**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

SHARON M. KOVARIK,

                          Plaintiff,

       - v. -                                          Civ. No. 6:03-CV-1114
                                                                   (LEK/RFT)

MICHAEL J. ASTRUE,[1] Commissioner of
Social Security,
                         Defendant.

| **APPEARANCES:** | **OF COUNSEL:** |
|---|---|
| OFFICE OF JONATHAN P. FOSTER<br>Attorney for Plaintiff<br>407 South Main Street<br>Athens, PA 18810 | JONATHAN P. FOSTER, ESQ. |
| HON. GLENN T. SUDDABY<br>United States Attorney for the Northern District of New York<br>Attorney for Defendant<br>Office of the United States Attorney<br>P.O. Box 7198<br>100 South Clinton Street<br>Syracuse, NY 13261 | WILLIAM H. PEASE<br>Assistant United States Attorney |

**RANDOLPH F. TREECE**
**UNITED STATES MAGISTRATE JUDGE**

**REPORT-RECOMMENDATION and ORDER**

      In this action, Plaintiff Sharon M. Kovarik moves, pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), for a review of a decision by the Commissioner of Social Security denying her application for disability insurance benefits ("DIB").[2]  Based upon the following discussion, this Court

---

[1] Michael J. Astrue is the current Commissioner of Social Security.  He shall be substituted as the named Defendant pursuant to FED. R. CIV. P. 25(d)(1).

[2] This case has proceeded in accordance with General Order 18, which sets forth the procedures to be followed when appealing a denial of Social Security Benefits.  Both parties have filed Briefs, though oral argument was not heard. Dkt. Nos. 23 & 28.  The matter was referred to the undersigned for Report-Recommendation pursuant to 28 U.S.C. § 636(b)
(continued...)

recommends that the Commissioner's decision denying Social Security benefits be **affirmed**.

## I. BACKGROUND

### A. Claimant's History

Sharon M. Kovarik, born on August 13, 1946, was fifty-four years old at the time she filed her application for benefits. Dkt. No. 22, Admin. Tr. [hereinafter "Tr."] at pp. 85-87. Kovarik has her high school degree and last worked in 1993 as a clerk in a bakery. *Id.* at pp. 21-22, 105, & 119. Kovarik claims a disability due to panic attacks, depression, hypertension, and diabetes. *Id.* at pp. 24, 26, 99, & 101. She also claims that on May 3, 1998, she suffered a "mini stroke," causing physical and mental problems such as memory loss and tremors. Dkt. No. 23, Pl.'s Br. at p. 2. Kovarik met the insured status earnings requirements for purposes of entitlement to DIB under Title II of the Social Security Act through June 30, 1998. Tr. at p. 88.

### B. Procedural History

On September 25, 2000, Kovarik filed for DIB, alleging a disability onset date of April 1, 1993. *Id.* at pp. 57 & 85-87. The application was denied initially and on reconsideration. *Id.* at pp. 57-62 & 66-68. On January 29, 2002, a Hearing was held before Administrative Law Judge ("ALJ") Franklin T. Russell. *Id.* at pp. 18-56. On August 29, 2002, the ALJ issued an unfavorable decision against Kovarik. *Id.* at pp. 8-16. On October 17, 2002, the Appeals Council concluded there was no basis under the Regulations to grant Kovarik's request for review, thus rendering the ALJ's decision the final decision of the Commissioner. *Id.* at pp. 5-6. Exhausting all her options for review through the Social

---

²(...continued)
and N.D.N.Y.L.R. 72.3(d).

Security Administration's tribunals, Kovarik now brings this appeal.[3]

## II. DISCUSSION

### A. Standard of Review

Under 42 U.S.C. §§ 405(g) and 1383(c)(3), the proper standard of review for this Court is not to employ a *de novo* review, but rather to discern whether substantial evidence supports the Commissioner's findings and that the correct legal standards have been applied. *See Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991); *Urtz v. Callahan*, 965 F. Supp. 324, 325-26 (N.D.N.Y. 1997) (citing, *inter alia*, *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987)). Succinctly defined, substantial evidence is "more than a mere scintilla," it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. of New York v. N.L.R.B.*, 305 U.S. 197, 229 (1938).

The ALJ must set forth the crucial factors supporting the decision with sufficient specificity. *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984). Where the ALJ's findings are supported by substantial evidence, the court may not interject its interpretation of the administrative record. *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988); 42 U.S.C. § 405(g). Where the weight of the evidence, however, does not meet the requirement for substantial evidence or a reasonable basis for doubt exists as to whether correct legal principles were applied, the ALJ's decision may not be affirmed. *Johnson v. Bowen*, 817 F.2d at 986.

### B. Determination of Disability

To be considered disabled within the meaning of the Social Security Act, a plaintiff must meet the insured status requirements of 42 U.S.C. § 423(c) and establish an "inability to engage in any

---

[3] This case was initially filed in the Middle District of Pennsylvania, then transferred to the Southern District of New York, and later transferred to this District. Dkt. Nos. 14 & 17.

substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). A disabling impairment is defined as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." *Id.* at § 1382c(a)(3)(D). Furthermore, the claimant's physical or mental impairments must be of such severity

> that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

*Id*. at § 1382c(a)(3)(B).

In this regard, "work which exists in the national economy" means "work which exists in significant numbers either in the region where such individual lives or in several regions of the country." *Id.*

In determining whether a claimant is disabled, the Commissioner follows a five-step analysis set forth in the Social Security Administration Regulations. 20 C.F.R. § 404.1520. At Step One, the Commissioner "considers whether the claimant is currently engaged in gainful activity." *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); 20 C.F.R. § 404.1520(a)(4)(i). If the claimant is engaged in substantial gainful activity, he or she is not disabled and the inquiry ends. If the claimant is not engaged in substantial gainful activity, the Commissioner proceeds to Step Two and assesses whether the claimant suffers from a severe impairment that significantly limits his or her physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(a)(4)(ii). If the claimant suffers from a severe impairment, the Commissioner considers at Step Three whether such impairment(s) meets or equals an impairment listed in Appendix 1, in Part 404, Subpart P of the Regulations. *Id.* at § 404.1520(a)(4)(iii). The Commissioner makes this assessment without considering vocational factors

such as age, education, and work experience. *Berry v. Schweiker*, 675 F.2d at 467. Where the claimant has such an impairment, the inquiry ceases as he or she is presumed to be disabled and unable to perform substantial gainful activity. *Id.* If the claimant's impairment(s) does not meet or equal the listed impairments, the Commissioner proceeds to Step Four and considers whether the claimant has the RFC[4] to perform his or her past relevant work despite the existence of severe impairments. 20 C.F.R. § 404.1520(a)(4)(iv). If the claimant cannot perform his or her past work, then at Step Five, the Commissioner considers whether the claimant can perform any other work available in the national economy. *Berry v. Schweiker*, 675 F.2d at 467; 20 C.F.R. § 404.1520(a)(4)(v).

     Initially, the burden of proof lies with the claimant to show that his or her impairment(s) prevents a return to previous employment (Steps One through Four). *Berry v. Schweiker*, 675 F.2d at 467. If the claimant meets that burden, the burden then shifts to the Commissioner at Step Five to establish, with specific reference to medical evidence, that the claimant's physical and/or mental impairment(s) are not of such severity as to prevent him or her from performing work that is available within the national economy. *Id.*; *see also White v. Sec'y of Health and Human Servs.*, 910 F.2d 64, 65 (2d Cir. 1990). In making this showing at Step Five, the claimant's RFC must be considered along with other vocational factors such as age, education, past work experience, and transferability of skills. 20 C.F.R. § 404.1520(a)(4)(v); *see also New York v. Sullivan*, 906 F.2d 910, 913 (2d Cir. 1990).

---

[4] "Residual functional capacity" is defined by the Regulations as follows: "Your impairment(s), and any related symptoms, such as pain, may cause physical and mental limitations that affect what you can do in a work setting. Your residual functional capacity is what you can still do despite your limitations." 20 C.F.R. § 404.1545(a).

### C. ALJ Russell's Findings

Kovarik was the only witness to testify at the Hearing. Tr. at pp. 18-56. In addition to such testimony, the ALJ had Kovarik's's medical records consisting of treatment reports and opinions from various treating physicians and a hospital, including, 1) Debra Ryan, M.D., Treating Internist; 2) Albert Lichtenstein, Ph.D., Treating Psychologist; 3) Manjula Kumar, M.D., Treating Psychiatrist; and 4) Robert Packer Hospital Emergency Room.[5] *Id.* at pp. 142-44, 150-63, 171-76, & 282-334.

ALJ Russell stated that Kovarik is insured for disability benefits through June 30, 1998, and, accordingly, she must establish a disability on or prior to that date. *Id*. at p. 12. Using the five-step disability evaluation, ALJ Russell found that 1) Kovarik had not engaged in any substantial gainful activity since the alleged onset date; and 2) Kovarik's diabetes mellitus and hypertension were not severe impairments, but her mental impairments were severe from March 20, 1997 to October 28, 1997. However because these severe impairments did not meet the durational requirement of twelve months, the ALJ determined Kovarik was not disabled. *Id*. at pp. 8-16. After reviewing the administrative transcript, the Court finds that the ALJ applied the correct legal standards and his findings are supported by substantial evidence of record.

### D. Kovarik's Contentions

Kovarik asserts several bases in support of her request that the Commissioner's decision be reversed. First, Kovarik claims that the ALJ's finding that she is not disabled is not supported by substantial evidence. She also contends that the ALJ erred by failing to "consider the entire record" of her treating sources and give full credibility to her allegations regarding the nature and intensity of

---

[5] Further medical records from various treating and consultive sources are included in the Administrative Record. However, Kovarik saw these sources after June 30, 1998, the expiration of her insured status.

her symptoms.[6]

### 1. Step Two - Severity of Impairments

At Step Two of the evaluation process, a claimant must prove the existence of a severe impairment that significantly limits his or her physical and/or mental ability to do basic work activities. *See* 20 C.F.R. § 404.1520(c); *see also* 20 C.F.R. § 404.1521(a) (noting that an impairment is <u>not severe</u> at Step Two if it does not significantly limit a claimant's ability to do basic work activities). The Regulations define "basic work activities" as the "abilities and aptitudes necessary to do most jobs," examples of which include,

>  (1) Physical functions such as walking, standing, lifting, pushing, pulling, reaching, carrying, or handling;
>  (2) Capacities for seeing, hearing, and speaking;
>  (3) Understanding, carrying out, and remembering simple instructions;
>  (4) Use of judgment;
>  (5) Responding appropriately to supervision, co-workers and usual work situations; and
>  (6) Dealing with changes in a routine work setting.

20 C.F.R. § 404.1521(b); *see also* Social Security Ruling 85-28, 1985 WL 56856, at *3-4, *Titles II and XVI: Medical Impairments That Are Not Severe* (S.S.A. 1985).

The Second Circuit has held that the Step Two analysis "may do no more than screen out *de minimis* claims." *Dixon v. Shalala*, 54 F.3d 1019, 1030 (2d Cir. 1995). If the disability claim rises above a *de minimis* level, then the remaining analysis of the claim at Steps Three through Five must be undertaken. *See id*. To be disabling, the severe impairment must have lasted or be expected to last for a continuous period of not less than twelve months. *See id.*; 20 C.F.R. § 404.1509. Furthermore, when a claimant

---

[6] The Court notes that Kovarik's Brief contains **no** citations to cases from the Court of Appeals for the Second Circuit or from District Courts within the Second Circuit. *See generally* Dkt. No. 23, Pl.'s Br. Instead, Plaintiff cites to cases from other Circuits. General Order 18 provides that with regard to briefs in Social Security appeals, "[c]ases from other districts and circuits should be cited *only in conjunction with relevant cases from this jurisdiction*[.]" *See* General Order 18 at p. 3 (emphasis added). The Court also notes that to the extent Kovarik refers to an unsupported "RFC finding" and asserts that the ALJ erroneously found that she had an RFC to perform sedentary work, we note that a claimant's RFC is assessed at Step Four of the disability analysis, whereas in the case at bar, the ALJ did not proceed past Step Two and therefore made no RFC determination. *See* Pl.'s Br. at pp. 2 & 13; *see also* 20 C.F.R. § 404.1545(a).

has multiple impairments, the Second Circuit has recognized the necessity of considering the combined effect of the claimant's impairments in determining disability as well as the claimant's ability to work, regardless of whether every impairment is severe. *Dixon v. Shalala*, 54 F.3d at 1031. "A finding of 'not severe' should be made if the medical evidence establishes only a 'slight abnormality' which would have 'no more than a minimal effect on an individual's ability to work.'" *Rosario v. Apfel*, 1999 WL 294727, at *5 (E.D.N.Y. Mar. 19, 1999) (quoting Social Security Ruling 85-28, 1985 WL 56856, at *3, *Titles II and XVI: Medical Impairments That Are Not Severe* (S.S.A. 1985)).

In this case, the ALJ found at Step Two that Kovarik's diabetes mellitus and hypertension were not severe impairments. Tr. at pp. 12-13. He also found that Kovarik's mental impairments were not severe during the periods from April 1, 1993 to March 19, 1997 and from October 29, 1997 to June 29, 1998. *Id.* at p. 15. With regard to the period from March 20, 1997 to October 28, 1997, the ALJ found that Kovarik's mental impairments were severe, but, because this period of time was less than the required twelve months, she was not disabled. *Id.* On appeal, Kovarik essentially contends that the ALJ's finding that she is not disabled is not supported by substantial evidence.[7]

### a. Diabetes Mellitus

The ALJ found that Kovarik's diabetes mellitus was not a severe impairment. Tr. at p. 13. The ALJ noted that this condition was "generally under good control, prior to the date last insured." *Id.* Debra Ryan, M.D., an internist, treated Kovarik's diabetic condition.[8] Dr. Ryan's treatment notes show that Kovarik's diabetes was, at times, under control. *See, e.g., id.* at pp. 290, 304, 310, 318, & 321.

---

[7] While the heading in Kovarik's Brief asserts that the ALJ failed to consider her impairments in combination, she fails to elucidate how the ALJ failed to do so and it appears that the substance of her argument, which is somewhat disjointed, is that the ALJ's finding that she is not disabled is not supported by the medical evidence. Pl.'s Br. at pp. 12-15.

[8] Dr. Ryan diagnosed Kovarik as suffering from hypertension, diabetes mellitus, and obesity. Tr. at p. 282.

And, the instances wherein such condition was not under control were relatively short term. *See generally id.* at pp. 282-334. Moreover, as the ALJ pointed out, "the record documents significant compliance issues in connection with the diabetes." *Id.* at p. 13. Indeed, on multiple occasions Dr. Ryan noted that Kovarik failed to check her chemstrips at home. *See, e.g., id.* at pp. 288, 298, 300, 302, 308, 314, 317, 321, 323, & 325. Treatment notes further document repeated discussions about losing weight, eating a low-fat diet, and periodically testing her blood sugar using chemstrips. *See, e.g., id.* at pp. 300, 318, 321, & 333. Moreover, at no time has any doctor opined that Kovarik's diabetes interfered with her ability to perform basic work activities. The mere presence of an impairment or establishment of treatment for an impairment is not enough to support a disability determination. *See, e.g., Burger v. Barnhart*, 476 F. Supp. 2d 248, 254 (W.D.N.Y. 2007). In fact, as discussed in more detail below, the record clearly reflects Kovarik was, at the time in question, maintaining three different households and was responsible for childcare for her grandchildren as well as another child. *See infra* Part II.D.3. Kovarik has failed to present medical evidence demonstrating that her diabetes mellitus significantly limited her physical or mental ability to do basic work activities. Therefore, the ALJ's finding in this regard is supported by substantial evidence.

### b. *Hypertension*

The ALJ found that Kovarik's hypertension was not a severe condition prior to the date last insured. Tr. at pp. 12-13. While Kovarik visited the emergency room twice due to her blood pressure, the ALJ noted that this condition "was essentially under control from the alleged onset date through the date last insured." *Id.* A review of the record shows that on numerous occasions, Dr. Ryan noted that Kovarik's hypertension was stable and under "control." *See, e.g., id.* at pp. 282, 288, 290, 302, 304, 306, 308, 310, 312, 313, 317, 319, 321, 323, 325, & 332. The ALJ also noted that Kovarik was

"not fully compliant with following a low salt diet, nor was she fully compliant with taking blood pressure readings at home." *See, e.g., id.* at pp. 12, 282, 286, 298, 301, 315, & 325. And, as with her diabetes, there is no indication in the record that her hypertension limited her ability to perform basic work activities. Accordingly, the ALJ's finding in this regard is supported by substantial evidence.

### *c. Mental Condition*

The Regulations require the ALJ to use a "special technique" to evaluate alleged mental impairments. *See* 20 C.F.R. § 404.1520a(a). In assessing the severity of a mental condition at Step Two, the ALJ must rate the degree of functional limitation resulting from the claimant's mental impairment. *Id.* at § 404.1520a(a)(1). For this purpose, the claimant's limitations in four "broad functional areas" are rated for degree of limitation. *Id.* at § 404.1520a(c)(3). The four areas consist of the following: (1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation. *Id.* The first three functional areas are assessed on a five-point scale consisting of: none, mild, moderate, marked, and extreme. *Id.* at § 404.1520a(c)(4). The fourth functional area, episodes of decompensation, is rated on a four-point scale: none, one or two, three, and four or more. *Id.* A ranking of "none" or "mild" limitations in the first three areas and "none" in the fourth area would generally warrant a finding that the claimant's mental impairments are not severe, "unless the evidence otherwise indicates that there is more than a minimal limitation in [a claimant's] ability to do basic work activities." *Id.* at § 404.1520a(d)(1).

Using the special technique, ALJ Russell found that during the periods of time from April 1, 1993 through March 19, 1997, and from October 29, 1997 through June 30, 1998, Kovarik was

   (1) mildly restricted in activities of daily living;

   (2) mildly restricted in maintaining social functioning;

  (3) mildly deficient in concentration, persistence or pace; and

  (4) had no episodes of decompensation.

From this, he concluded that Kovarik did not suffer from a severe mental impairment during such periods of time. Tr. at pp. 13-16. The ALJ then found that during the period from March 20, 1997 through October 28, 1997, Kovarik was

  (1) mildly restricted in activities of daily living;

  (2) moderately restricted in maintaining social functioning;

  (3) moderately deficient in concentration, persistence or pace; and

  (4) had no episodes of decompensation.

Thus, the ALJ concluded that Kovarik's mental impairments were severe during this time period. *Id.* at p. 15. However, because the severe impairment did not satisfy the twelve-month durational requirement, Kovarik was not disabled. *Id.* After a review of the record, the Court concludes that this finding is supported by substantial evidence.

  Regarding the period of April 1, 1993 through March 19, 1997, Kovarik sought treatment from Dr. Ryan. *Id*. at pp. 282-318. During that period of time, Dr. Ryan noted that Kovarik cried and experienced anxiety during the appointments and complained of experiencing depression, anxiety, and panic attacks. *See id.*. Though on January 6, 1997, Dr. Ryan noted that Kovarik "generally feels well" and that "[h]er mood overall is much improved compared to last visit[,]" on March 6, 1997, Dr. Ryan noted that Kovarik was "very tearful and emotional" and referred her to Manjula Kumar, M.D., a psychiatrist. *Id.* at pp. 315-17. During this time, Dr. Ryan prescribed various medications, including Zoloft and Xanax. *Id.* at pp. 282-318.

  In the interim, Kovarik saw Albert Lichtenstein, Ph.D., on six occasions from May through

August of 1996. *Id*. at 142-44. During the initial session, Dr. Lichtenstein noted that Kovarik reported "crying spells" and "daily panic attacks. . . . [which] ha[ve] been a life long problem that has waxed and waned and is currently better than it was some twenty years ago. . . . [but] that her depression has gotten worse." *Id.* at p. 142. Dr. Lichtenstein also noted that Kovarik's speech was fluent, her cognition was intact, and there was no overt evidence of thought disorder, hallucinations, or delusions. *Id.* He initially diagnosed Kovarik as suffering from panic disorder and depression. *Id.* The remaining progress notes essentially describe Kovarik's concerns about various family members and the death of her mother, which occurred approximately eleven years prior. *Id.* at pp. 142-44. He noted that Kovarik reported "some crying spells," difficulty breathing, and feeling "more nervous." *Id.* at p. 143.

Regarding the period of March 20, 1997 to October 28, 1997, Kovarik began treating with Dr. Kumar on March 20, 1997. *Id*. at pp. 150-51. She diagnosed Kovarik as suffering from depression, noting that Kovarik's "attention and concentration were impaired, but she had a fair insight." *Id.* at p. 151. Kovarik saw Dr. Kumar approximately four months later, at which time Dr. Kumar noted that Kovarik was "very moody, crying, and depressed." *Id.* at p. 152. Kovarik returned three weeks later and was noted to be "much calmer and composed compared to the previous two visits." *Id.* at p. 153. At the next session, on August 29, 1997, Kovarik discussed the death of her mother and "cried her heart out during the interview [but] towards the end was able to compose herself[.]" *Id.* at p. 154. At the next session, on October 28, 1997, Dr. Kumar noted that Kovarik was "quite happy saying that she and her older sister were now on talking terms and she had gone bowling on Tuesday night" and that Kovarik was "calm and composed though occasionally she is tearful but is able to deal with the complex situation without getting upset." *Id.* at p. 155. Similarly, Dr. Ryan noted on the same day that Kovarik's anxiety and depression were "improved." *Id.* at p. 324.

Regarding the period of October 29, 1997 to June 30, 1998, the date Kovarik's insured status expired, Kovarik's mental condition generally improved. For instance, on December 2, 1997, Dr. Kumar noted that Kovarik that with "continued psychotherapy . . . is improving." *Id*. at p. 156. While on December 15, 1997, Dr. Kumar noted that Kovarik stated she felt "lonely and depressed," when she returned on January 7, 1998, Dr. Kumar noted that Kovarik "was in a better mood today," was "cracking" jokes, and stated that "this seems to be a very positive session for her[.]" *Id.* at pp. 157 & 159. On March 10, 1998, Dr. Kumar noted that Kovarik "stated that she has been feeling slightly better and that her anxiety is less though she still feels tired." *Id.* at p. 161. On April 7, 1998, Dr. Ryan noted that "[o]verall her mood is very much improved and she is feeling better than she has in over a year." *Id.* at p. 329. On April 8, 1998, Dr. Kumar noted that Kovarik stated "that she has been feeling much better. She has been having more energy and has been interested . . . . She feels that her medication is working for her . . . . It was good to see the improvement in her. The patient was also pleased with her progress." *Id.* at p. 162. On May 20, 1998, Dr. Kumar noted that Kovarik

> states that she been feeling so much better and she cannot believe that last year she was a mess. Her life is going more smoothly. She has developed a positive attitude and doesn't let small things bother her. There are no more crying spells. Mood is euthymic with congruent affect. Attitude is positive. She feels good about herself.

*Id.* at p. 163.

On June 17, 1998, Dr. Ryan noted that Kovarik's "overall mood remains much improved despite several stressors." *Id.* at p. 331.

The foregoing provides substantial evidence supporting the ALJ's finding that Kovarik's mental impairments were not severe during the period from April 1, 1993 to March 19, 1997 and from October 29, 1997 to June 30, 1998, but were severe during the period from March 20, 1997 to October 28, 1997. However, because the severe impairment did not last for the required duration of twelve months, the

ALJ properly found that Kovarik was not disabled.

### 2. Treating Physician Rule

Plaintiff asserts that the ALJ erred in correctly applying the Treating Physician Rule when he discounted, or failed to consider, a significant portion of the medical record and, further, the "medical reports from 1993 through 2001 show a consistent and continual decline in her physical and mental health." Pl.'s Br. at p. 11.

In order to receive benefits, a claimant must have been unable to engage in substantial gainful activity on or prior to the last date on which the claimant was insured by the Social Security Act. *Gold v. Sec'y of Health, Educ. & Welfare*, 463 F.2d 38, 41 (2d Cir. 1972); 42 U.S.C. §§ 423(a)(1)(A), (c)(1). In this case, Plaintiff was last insured on June 30, 1998. Thus, an ALJ may properly discount medical records beyond such date inasmuch as such evidence fails to establish a disability prior to the date last insured (DLI). *See Armone v. Bowen*, 882 F.2d 34, 37-38 (2d Cir. 1989) (explaining the quantification of a claimant's insured status); *Hartfiel v. Apfel*, 192 F. Supp. 2d 41, 43 (W.D.N.Y. 2001) (finding claimant failed to establish disability prior to expiration of insured status); *Vincent v. Shalala*, 830 F. Supp. 126, 128 (N.D.N.Y. 1993) (finding that injuries sustained after expiration of insured status are irrelevant to a determination of eligibility for disability benefits).

Beyond a recitation of the medical "facts," Plaintiff fails to point to particular evidence that the ALJ ignored which establishes the presence of a disability prior to the expiration of her insured status. In fact, by her own admission, the records to which she criticizes the ALJ for ignoring establish, in her estimation, a continued decline or deterioration of her mental condition. Whether or not Plaintiff's mental impairment (or other impairments) deteriorated, worsened, or intensified after June 30, 1998, is of no moment. To reiterate, her burden pursuant to the Regulations is to establish the existence of

a disability prior to her DLI, which she has failed to do. In this regard, the ALJ properly discounted medical records beyond June 30, 1998.

Because Plaintiff's legal argument is somewhat disjointed, *see supra* notes 6 & 7, we further examine whether the ALJ followed the Treating Physician Rule as to the period of time predating Plaintiff's DLI. Again we note Kovarik's failure to point to specific information which she claims the ALJ failed to consider. Instead she simply refers to an eight-page recitation of procedural history and medical evidence set forth in her Brief. Pl.'s Br. at pp. 10-11. With this in mind, we review the applicable legal principles to be applied.

Under the Regulations, a treating physician's opinion is entitled to "controlling weight" where it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2); *see also Rosa v. Callahan*, 168 F.3d 72, 78-79 (2d Cir. 1999). The treating physician doctrine recognizes that a claimant's treating sources, which in most cases are medical professionals, are more apt to "provide a detailed, longitudinal picture of [the patient's] medical impairment(s) and may bring a unique perspective to the medical findings" as opposed to an evaluation of a one-time non-examining, non-treating physician. 20 C.F.R. § 404.1527(d)(2); *see Schisler v. Sullivan*, 3 F.3d 563, 568 (2d Cir. 1993).

In analyzing a treating physician's opinion, "the ALJ cannot arbitrarily substitute his [or her] own judgment for competent medical opinion." *McBrayer v. Sec'y of Health and Human Servs.*, 712 F.2d 795, 799 (2d Cir. 1983). Furthermore, when weighing all medical opinions and assessing what weight to accord, "[t]he duration of a patient-physician relationship, the reasoning accompanying the opinion, the opinion's consistency with other evidence, and the physician's specialization or lack

thereof" are considerations. *Schisler v. Sullivan*, 3 F.3d at 568; 20 C.F.R. §§ 404.1527(d)(1)-(6) & 416.927(d)(1)-(6); *see also Schaal v. Apfel*, 134 F.3d 496 (2d Cir. 1998). In the event the ALJ does not give controlling weight to the treating physician, he must specifically state the reasons for doing so. 20 C.F.R. § 404.1527(d)(2).

A review of the ALJ's decision reveals that the ALJ did not substitute his opinion in place of an opinion from a treating physician because no treating physician rendered a formal opinion as to Kovaric's functional abilities. Moreover, the ALJ's decision gives no indication that he rejected nor discounted any treating source's findings. In fact, in making his assessments, the ALJ cites to various physicians' records and medical findings/opinions stated therein. Accordingly, Kovarik's claim is unavailing.

### 3. Credibility

In her Brief, Plaintiff challenges the fact that the ALJ deemed her testimony to be only partially credible. Pl.'s Br. at pp. 11-12. In assessing Kovarik's credibility, the ALJ stated that Kovarik's "testimony and other representations as to the severity and disabling nature of her symptoms are only partially credible, at best." Tr. at p. 14. As explained below, the ALJ's finding in this regard is supported by substantial evidence.

Under 20 C.F.R. § 404.1529(a), a claimant's description of symptoms and subjective pain will be considered in determining a claim for disability to the extent in which "symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." A claimant's statement about the persistence, intensity, and limiting effects of these symptoms are evaluated in the context of all objective medical evidence, which includes medical signs and laboratory findings. 20 C.F.R. at § 404.1529(c). Once medically objective evidence is submitted, the ALJ must identify the

severity of the pain and whether that pain will limit the claimant's ability to work. *Id.* "It is well settled that 'a claimant's subjective evidence of pain is entitled to great weight' where . . . it is supported by objective medical evidence." *Simmons v. United States R.R. Ret. Bd.*, 982 F.2d 49, 56 (2d Cir. 1992) (quoting *Rivera v. Schweiker*, 717 F.2d 719, 725 (2d Cir. 1983)). However, in a case where subjective symptoms are identified, "the ALJ has discretion to evaluate the credibility of the claimant and to arrive at an independent judgment, in light of the medical findings and other evidence, regarding the true extent of the pain alleged." *Brandon v. Bowen*, 666 F. Supp. 604, 608 (S.D.N.Y 1987). Where the ALJ resolves to reject subjective testimony with regards to pain and other symptoms, he or she "must do so explicitly and with sufficient specificity to enable the Court to decide whether there are legitimate reasons for the ALJ's disbelief and whether his [or her] determination is supported by substantial evidence." *Id.* at 608 (citing, *inter alia*, *Valente v. Sec'y of Health and Human Servs.*, 733 F.2d 1037, 1045 (2d Cir. 1985)). In evaluating a claimant's complaints of pain, an ALJ must consider several factors set forth in the Regulations including:

> (i) [The claimant's] daily activities;
> (ii) The location, duration, frequency, and intensity of [claimant's] pain or other symptoms;
> (iii) Precipitating and aggravating factors;
> (iv) The type, dosage, effectiveness, and side effects of any medication [claimant] take[s] or ha[s] taken to alleviate [his or her] pain or other symptoms;
> (v) Treatment, other than medication, [claimant] receive[s] or ha[s] received for relief of [his or her] pain or other symptoms;
> (vi) Any measures [claimant] use[s] or ha[s] used to relieve [his or her] pain or other symptoms (e.g., lying flat on [his or her] back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and
> (vii) Other factors concerning [claimant's] functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. § 404. 1529(c)(3).

Kovarik maintains that the ALJ failed to properly "address" her testimony regarding her daily activities, as well as take into account her favorable work history. Pl.'s Br. at pp. 11-12. Defendant

contends that the ALJ properly evaluated Kovarik's credibility and that work history is just one of the many factors an ALJ must consider. Def.'s Br. at pp. 18-20.

With regard to Kovarik's daily activities, the ALJ provided a somewhat detailed summary of Kovarik's testimony as to her daily activities. Tr. at pp. 14-15. The ALJ recited Kovarik's testimony regarding the period in question wherein she stated that "her typical day involved getting up, showering, getting breakfast, picking up the house, watching television, and doing light cooking. She further testified that she was not doing any housekeeping or laundry." *Id.* The ALJ then found that her testimony was not supported by the medical records. "One strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record." S.S.R. 96-7p, 1996 WL 374186, at *5, *Policy Interpretation Ruling Titles II and XVI: Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements* (S.S.A. 1996). Here, the ALJ found that according to medical records during the period in issue, Kovarik had "extensive babysitting and child care duties," cared for several dogs, and spent hours doing laundry and cleaning. Tr. at pp. 14-15. Indeed, on December 2, 1997, Dr. Kumar noted that Kovarik reported that she was taking care of her grandson "and has to take him and bring him back to school along with some house chores." *Id.* at p. 156. On December 15, 1997, Dr. Kumar's notes reflect that Kovarik reported she was "trying to help her [son] and [grandson] with the house and helping [her grandson] to get ready for school and bringing him home . . . . [S]he feels that she doesn't have enough hours during the day. She is running all day long trying to beat the clock[.]" *Id.* at p. 157. On January 7, 1998, Dr. Kumar noted that Kovarik "has been taking care of [her grandson] . . . and she has to take [him] to school and then do the housework." *Id.* at p. 159. On February 4, 1998, Dr. Ryan noted that Kovarik "does quite a bit of baby-sitting and is up at 4:15 every morning to watch [her

grandchildren]." *Id.* at p. 325. On February 11, 1998, Dr. Kumar noted that Kovarik reported she had been "taking care of both the grandchildren and caring for three houses including [her son's] dogs and her own" and that she had been "spending hours of time cleaning and doing laundry." *Id.* at p. 161. On March 30, 1998, Dr. Kumar noted that Kovarik was babysitting one of her friend's daughters. *Id.* On June 17, 1998, Dr. Ryan noted that Kovarik was "the primary caretaker" for her grandchildren. *Id.* at p. 331. Accordingly, the record provides substantial support for the ALJ's finding that Kovarik's testimony as to her daily activities was not supported by the medical records.

With regard to Kovarik's work history, the Regulations provide that the fact-finder "will consider all of the evidence presented, including information about your prior work record." 20 C.F.R. § 404.1529(c)(3). Moreover, ALJs are specifically instructed that credibility determinations should take account of a claimant's "prior work record." S.S.R. 96-7p, 1996 WL 374186, at *5. However, "work history is just one of many factors that the ALJ is instructed to consider in weighing the credibility of claimant testimony." *Schaal v. Apfel*, 134 F.3d 496, 502 (2d Cir. 1998). Here, a review of the decision shows that the ALJ considered Kovarik's past relevant work history as a bakery clerk. Tr. at pp. 12-13. Additionally, the Hearing testimony shows that the ALJ questioned Kovarik extensively about that position and that Kovarik's counsel questioned her about other positions she held before the bakery position. *Id.* at pp. 21-23, 26, & 44-47. Thus, the ALJ properly considered Kovarik's past work history, which was just one of many factors to consider, while assessing Kovarik's credibility. As such, we find that the ALJ applied the correct legal standards in assessing Kovarik's credibility and his decision is supported by substantial evidence.

### III. CONCLUSION

**WHEREFORE**, it is hereby

**RECOMMENDED**, that the Commissioner's decision denying disability benefits be **AFFIRMED**; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten (10) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); *see also* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72, 6(a), & 6(e).

IT IS SO ORDERED

Dated: February 19, 2008
       Albany, New York

_____
RANDOLPH F. TREECE
United States Magistrate Judge